RINGLING BROS., BARNUM & BAILEY COMBINED SHOWS, INC. *v.* UNITED STATES (No. 4458)[1]

United States Court of Customs and Patent Appeals, March 6, 1944

*John F. Reddy, Jr.* for appellant.

*Paul P. Rao*, Assistant Attorney General (*Frank E. Carstarphen* and *Joseph F. Donohue*, special attorneys, of counsel) for the United States.

[Oral argument February 2, 1944, by Mr. Reddy, Jr. and Mr. Donohue]

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges

LENROOT, Judge, delivered the opinion of the court:

This is an appeal from a judgment of the United States Customs Court, Third Division, denying appellant's petition for remission of

[1] C. A. D. 272

additional duties assessed pursuant to the provisions of section 489 of the Tariff Act of 1930. The additional duties were levied by reason of the undervaluation of a certain gorilla imported by appellant from Havana, Cuba, and entered at the port of Port Everglades, Fla., on February 19, 1941.

The entered value of the gorilla was $1,000, and its final appraised value was $8,750. The additional duties assessed amount to $6,562.50.

Section 489, *supra*, insofar as it is here pertinent, reads as follows:

SEC. 489. ADDITIONAL DUTIES.

. If the final appraised value of any article of imported merchandise which is subject to an ad valorem rate of duty or to a duty based upon or regulated in any manner by the value thereof shall exceed the entered value, there shall be levied, collected, and paid, in addition to the duties imposed by law on such merchandise, an additional duty of 1 per centum of the total final appraised value thereof for each 1 per centum that such final appraised value exceeds the value declared in the entry. Such additional duty shall apply only to the particular article or articles in each invoice that are so advanced in value upon final appraisement and shall not be imposed upon any article upon which the amount of duty imposed by law on account of the final appraised value does not exceed the amount of duty that would be imposed if the final appraised value did not exceed the entered value, and shall be limited to 75 per centum of the final appraised value of such article or articles. Such additional duties shall not be construed to be penal and shall not be remitted nor payment thereof in any way avoided, except in the case of a clerical error, upon the order of the Secretary of the Treasury, or in any case upon the finding of the United States Customs Court, upon a petition filed at any time after final appraisement and before the expiration of sixty days after liquidation and supported by satisfactory evidence under such rules as the court may prescribe, that the entry of the merchandise at a less value than that returned upon final appraisement was without any intention to defraud the revenue of the United States or to conceal or misrepresent the facts of the case or to deceive the appraiser as to the value of the merchandise. If the appraised value of any merchandise exceeds the value declared in the entry by more than 100 per centum, such entry shall be presumptively fraudulent, and the collector shall seize the whole case or package containing such merchandise and proceed as in case of forfeiture for violation of the customs laws; and in any legal proceeding other than a criminal prosecution that may result from such seizure, the undervaluation as shown by the appraisal shall be presumptive evidence of fraud, and the burden of proof shall be on the claimant to rebut the same, and forfeiture shall be adjudged unless he rebuts such presumption of fraud by sufficient evidence.

Upon the making of such order or finding, the additional duties shall be remitted or refunded, wholly or in part, and the entry shall be liquidated or reliquidated accordingly. Such additional duties shall not be refunded in case of exportation of the merchandise, nor shall they be subject to the benefit of drawback. All additional duties, penalties, or forfeitures applicable to merchandise entered in connection with a certified invoice shall be alike applicable to merchandise entered in connection with a seller's or shipper's invoice or statement in the form of an invoice.

\* \* \* \* \* \* \*

It appears from the record that on February 19, 1941, appellant through its agent, one J. C. Donahue, filed a consumption entry

covering "One Female Gorilla, Named 'Toto,'" valued at $1,000, entered under paragraph 715 of said tariff act at the rate of 15 per centum ad valorem. Concurrently with the filing of this entry, said agent also filed a consular invoice covering said gorilla in which it was stated that its value was $1,000 "CIF Sarasota, Fla."

It appears that the gorilla was purchased by appellant in Havana, Cuba, from one Mrs. E. Kenneth Hoyt, and the sum of $8,750 was paid therefor. Mr. John Ringling North, president of appellant, made the purchase. It further appears that at the time of said purchase appellant was the owner of a male gorilla named "Gargantua."

Donahue was the principal witness in behalf of appellant and testified in substance as follows: That he was the railroad traffic manager of appellant's circus, having in charge all of the railroad movements in its operation; that in February 1941, by direction of John Ringling North, he was placed in charge of the transportation of said gorilla from Cuba to the United States and of all proceedings incident thereto; that he proceeded to Port Everglades, the point at which importation was to be made, and first interviewed one Charles P. Hogeboom, Deputy Collector in Charge of Customs at that point, and that said Hogeboom suggested to him that the gorilla might possibly be entitled to free entry as being imported for breeding purposes; that this was the first time that this possibility had been brought to his attention; that Hogeboom promised to take the matter up with the customs office at Tampa, and believed he would have the necessary information when the witness returned from Cuba. At this point we would observe that the record does not disclose that the witness told Hogeboom for what purpose the gorilla was to be imported, or that appellant had in its circus a male gorilla.

The witness further testified that at Port Everglades he employed a customs broker, one James S. Moore, to represent appellant in customs matters incident to the importation of the gorilla; that one of these matters involved the export of a very expensive cage in which the gorilla was to be imported; that he told Mr. Moore that he knew nothing of customs, that he put himself in his hands for the importation of the animal; and that he discussed with Moore the matter of the gorilla being admitted free for breeding purposes.

The witness further testified that he proceeded to Havana, Cuba, and consulted with Mr. William S. Loudermilk of the Florida East Coast Car Ferry Co., which company was to transport the gorilla to the United States, and at the suggestion of Loudermilk one F. A. Nistal, a customs broker, was engaged to represent appellant in customs matters incident to the exportation of the gorilla; that said Nistal came to Mr. Loudermilk's office and there, in the presence of Loudermilk, he (Donahue) requested Nistal to make out all the neces-

sary papers and attend to everything pertaining to the exportation of the animal.

The witness further testified as follows:

Q. * * *. What did you tell Mr. Nistal and Mr. Loudermilk concerning the entry of the gorilla into the United States?—A. I told him I thought the animal would be admitted free of duty because we were to breed the animal. It was my understanding that the animal was to be bred.

Upon cross-examination the witness testified as follows:

X Q. Didn't he (Nistal) ask you what the value of the animal is?—A. He did, and I couldn't tell.

X Q. But you told him you couldn't tell him exactly, didn't you?—A. I told him I did not know the value of the animal.

X Q. Exactly. Then you were contented at entering it at $1,000, were you?— A. I knew nothing of the consular invoice or papers of that kind. I thought the man knew his business.

X Q. Didn't he tell you he wanted the information to use it in the consular invoice?—A. He did not. He asked me the value of the animal, and I did not know at that time.

X Q. Did you make any effort to find out?—A. I did not.

X Q. You were there as the representative of Mr. North, weren't you?—Were you or were you not?—A. I was:

X Q. Well, was Mr. North there?—A. Mr. North was there.

X Q. Why didn't you go and ask him?—A. Didn't think of it, because I thought the animal was going to be admitted free.

Upon direct examination the witness further testified that the customs broker suggested that a nominal value of $1,000 be placed on the gorilla; that he secured through Mr. Loudermilk the consular invoice but had no recollection of reading it, but did sign some papers which Mr. Loudermilk gave him. The consular invoice bears the date of February 17, 1941, and the value of the gorilla is stated as $1,000. It bears the signature of the witness Donahue. It appears that the first conversation that the witness had with Nistal was on Friday, February 14. The witness testified that on the next day, Saturday, February 15, he had a conversation with John Ringling North, at which time Mr. North gave him his personal check made out to the United States Customs with the amount left blank to be used to pay the required duty; that Mr. North did not at that time tell him the cost of the gorilla and he did not ask North what the cost was; that on Tuesday, February 18, he signed the papers that Mr. Loudermilk had given him and gave them to the young man that accompanied the transportation of the gorilla to the United States; that later on that afternoon, while the cage was being loaded, Mr. North told him that the gorilla had cost $8,750; that on February 19 he (Donahue) arrived at Port Everglades, and found that the gorilla, in its cage, had arrived; that he saw Mr. Hogeboom and learned that free entry of the gorilla could not be made without certain documents; that his customs broker at Port Everglades told him that the valuation

of $1,000 was low and requested him to put up another bond for $1,000 which he did, and he (the witness) made the entry for appellant after securing a power of attorney from appellant to do so.

The testimony of the witness with respect to the consumption entry reads as follows:

Q. Mr. Donahue, I show you consumption entry number H–88, dated February 19, 1941, covering the importation of one female gorilla named Toto, and I ask whether that is your signature at the bottom?—A. It is.

Q. And is this your signature on the reverse side of the paper?—A. It is.

Q. Now will you look at that paper? Do you recognize that as one of the papers which you signed after, as I understand it, the arrangements were made for letting the gorilla go from the port?—A. Yes, sir.

Q. That is one of the papers?—A. Yes, sir.

Q. Had you ever seen that paper before?—A. No, sir.

Q. Had you ever seen the figures on that paper which ——A. I had the paper in my possession, but I didn't look at it.

Q. Was this one of the papers which was in the envelope which you gave to the employee who gave it to Mr. Hogeboom? I will withdraw that question. Did you read this paper before you signed it?—A. I did not.

The witness further testified that he was not asked by either Mr. Moore or Mr. Hogeboom if he knew the cost of the gorilla. He gave as his reason for not stating the cost that he thought the gorilla would be admitted free for breeding purposes; that he left Mr. North's blank check with Mr. Hogeboom who filled it out by typewriting thereon the sum of $150. In this connection he testified as follows:

Q. What was your understanding in connection with the payment of that $150?—A. My understanding was that that would apply on any duty that would accrue if the animal was not admitted for breeding purpose and more duty was added, and it was my understanding the appraisement would be made at Sarasota.

*      *      *      *      *      *      *

Q. Was it your understanding more duty might be paid later?—A. I didn't know. If the animal was not admitted for breeding purpose, yes.

Q. You understood that part of it?—A. I understood that, yes.

The witness testified further that he never had any intention to defraud the Government or to conceal the facts of the case in any way. He also testified that at the time of exportation of the gorilla and its entry in this country he was suffering from the "flu," and several witnesses corroborated this statement.

Mr. North also testified in behalf of appellant and produced a letter from his attorneys, dated December 26, 1940, which was introduced in evidence. From this letter it appears that Mr. North was advised that the gorilla would be subject to duty at the rate of 15 per centum ad valorem.

North further testified that A. G. Watson, Jr., Assistant Collector of Customs for the State of Florida, had phoned him stating that he would like to be of any assistance possible with respect to the impor-

tation of the gorilla, and asked him if he was familiar with what the duty was.

With respect to this conversation with Watson, the witness testified as follows:

I thanked him very much for that, and he asked me if I were familiar with what the duty was. I said yes, that I had had word from my attorney at New York, and that I understood the duty was approximately $1,300.

He then told me that he understood that we were considering bringing the animal in duty free for breeding purposes, and it was bit of a surprise to me when Mr. Watson told me that because Mr. Donahue as yet had not informed me of it, and that is the first I knew of it. But I asked Mr. Watson about it, whether such a thing were possible, and he said that he doubted it very much because, in the first place, you have to establish a blood line, that he didn't know whether that would apply to animals; that it did apply to breeds like horses and dogs and cattle, I assume.

I asked him what was necessary in connection with this, and I believe he said you had to apply to the Department of Agriculture to get a number which would establish the line, and my recollection is that also he asked me at that same time, "But, Mr. North, are you not going to exhibit these gorillas?" And I said, "Well, obviously, we surely are, Mr. Watson, surely, but we do intend to breed them, because they would be very much more valuable to us, there never having been any gorillas born in captivity in all history. They would be much more valuable to us for exhibition purposes if we were able to have the first gorilla in captivity—first gorilla born in captivity."

And let's see now. I believe that he said again that he doubted whether that was possible, but that if we could establish that that was the reason that that was going to be done that there was a law which would permit us to bring the gorilla in free if she would come under that classification; and I said at that time that I hoped she would because if we could save the duty I would be glad to do it.

*   *   *   *   *   *   *

Q. What was your understanding as to what further need be done in order to have Toto entered free for breeding purposes?—A. Well, I understood from Mr. Watson when I talked to him, I believed that Mr. Donahue had been discussing this matter, from what I gathered from Mr. Watson at that time, and I know since that that is right; and that they had phoned from Port Everglades, I believe it was, to Mr. Watson's office in Tampa to explore the possibility of bringing the gorilla in for breeding purposes without paying any duty.

The witness further testified that he went to Havana, Cuba, a few days before the gorilla was shipped, and there saw the witness Donahue to whom he gave his personal blank check to be used in paying the duty upon the gorilla in case it could not be entered free for breeding purposes; that about an hour before the gorilla was shipped he had another conversation with Donahue with respect to which he testified as follows:

I next saw him just before the gorilla left. I guess it was about an hour before, and we talked down in the yard where they were loading the cage, and at that time he was catching the plane back, I think, right after the boat sailed, and from then he was going on to Chicago right away, and I was not to see him again.

At that time I told him that the gorilla had cost $8,750 and that according to the law the duty would be 15 percent on it unless he was successful in establish-

ing the fact that we were bringing the gorilla in for breeding purposes, in which event we wouldn't have to pay any duty. I wished him good luck, and said I hoped that he was able to bring it in without paying any duty.

Q. Had you previously told him what the gorilla had cost?—A. No, I don't believe I had.

At this point we would observe that Mr. North did not testify to any efforts by him or by others in behalf of appellant to establish before the customs officers that the gorilla was imported for breeding purposes, nor is there anything in the record that such efforts were made by anyone.

Charles B. Hogeboom, hereinbefore referred to, was a witness on behalf of the Government, and testified that he did not suggest to Donahue that the gorilla could be imported free of duty for breeding purposes, but that Donahue told him that he had been informed by someone in the Bureau that it could be so entered. Upon this point he further testified as follows:

I recited to him the provisions of paragraph 1706 of the tariff act, which covers entry of animals for breeding purposes, and informed him of the various documents he would have to produce. He said he thought he could get them. We dropped that subject for the time being.

The witness further testified that on February 19, Mr. Moore, the customs broker, brought the invoice to him and told him that he did not want to enter the gorilla under his bond, because, in his opinion, the gorilla was valued at a very low price and "he didn't want to hypothecate his bond due to the danger of undervaluation"; that Mr. Moore, being unwilling to enter the gorilla under his own bond it was finally entered by Donahue under the name of the appellant, his principal, at the value of $1,000, and a single entry bond for said amount was filed.

James S. Moore, the customs agent, was a witness on behalf of the Government and testified that he advised Donahue that the gorilla could not be entered free of duty for breeding purposes because of the lack of supporting documents, and that he declined to make the entry in his own name because the value stated in the consular invoice was "rather low." Upon this point the witness testified as follows:

Q. What, if anything, did you advise Mr. Donahue with reference to the possibility of what would happen to you with your bond if this was found to be different than the $1,000?—A. I did advise him that the animal being under an ad valorem rate of duty would be subject to a final appraisement, and that if the value was not as appraised that he would be subject to various penalties, additional duty; and I said in view of this value on the invoice and no supporting documents that we would rather not handle it under our name and bond as nominal consignee.

Q. Well, why and how would that have affected your bond?—A. Well, I was afraid of the possibility of litigation in our name.

Q. At any rate, you declined and did not make the entry; that is correct, isn't it?—A. Yes, I declined to make the entry in our name.

The witness further testified that Donahue never told him that the gorilla cost $8,750, and that he typed the consumption entry for Mr. Donahue.

F. A. Nistal, the customs broker at Havana hereinbefore referred to, testified in behalf of appellant, in part, as follows:

A. * * *. I asked Mr. Donahue what the value of said gorilla was for the purpose of the exportation tax out of Cuba. He told me the value was very high. They were paying several thousands of dollars for this gorilla he said. I asked him if he wanted to give me the exact value or cost of the gorilla. He told me if it was necessary he would do so but this gorilla was being advertised for a much higher value than it really cost and was being advertised in the papers as worth $100,000.

Q. Did Mr. Donahue tell you he knew what the price of the gorilla was?
A. No.
Q. Did you understand that he knew what the price of the gorilla was?
A. I did not.
Q. Did he say he would have to find out what the price was if you required it?
A. We didn't go that far.
Q. Continue with your conversation with Mr. Donahue and Mr. Loudermilk.
A. I told Mr. Donahue it was not necessary to give me the exact value because he had previously informed me that this gorilla was to be admitted into the United States free of duty. Therefore, I did not think that it was necessary to state the exact value insofar as said value was only required for deposit of the export tax of ¼ of 1% to which all exportations from Cuba are subject. Then we agreed to fix a nominal value of $1,000, which I declared on the invoice in the Declaration of Agent.

Q. What reason did Mr. Donahue give when he said that the gorilla would be admitted into the United States free of duty?
A. He told me that representatives of Ringling Bros. in Washington had taken the matter up with the Treasury Department and that this gorilla was to be imported as a thoroughbred animal for breeding purposes.

Q. Is the export tax to which you referred refunded to the exporter after the merchandise has been paid for?
A. Yes, the Cuban tax of ¼ of 1% is paid on deposit and is returned if payment for the merchandise is effected within ninety days.

Upon cross-examination the witness testified in part as follows:

Q. Did Mr. Donahue state to whom the gorilla belonged?
A. He told me it had been purchased by Ringling Bros.
Q. Did he tell you how long prior to this time the gorilla had been purchased?
A. No, sir.
Q. You in your capacity as customhouse broker naturally asked him what the gorilla was worth?
A. Yes, sir.
Q. And what did he tell you?
A. He told me the gorilla was worth $7,000 or $8,000 but that it was advertised for much more.
Q. Did he tell you from whom he received information on which he based his statement that the gorilla was worth $7,000 or $8,000.
A. No, sir.

There is testimony in the record tending to establish that there were no other sales of gorillas either in Cuba or in the United States at or near the date of the importation here involved.

The foregoing recital of testimony is sufficient for the purpose of decision herein.

Appellant makes two contentions:

1. "The importer has shown good faith entitling it to remission of the additional duty," and

2. "The additional duty was illegally levied, since no value was ascertainable for the merchandise, and the importer is therefore entitled to remission."

We will first consider the first contention.

It is an established fact that the final appraised value of the gorilla in question was $8,750, and that it was undervalued by Donahue, appellant's agent, to the extent of $7,750.

In the case of *Wolf & Co.* v. *United States*, 13 Ct. Cust. Appls. 589, T. D. 41453, after citing a number of cases bearing upon the proof required from a petitioner for the remission of additional duties, we said:

Summarized, these adjudged cases announce certain fundamental facts which the petitioner must establish if he is to obtain relief: First, He must show that in undervaluing his goods he was acting in entire good faith; second, that there were no facts or circumstances known to the petitioner when he made his entry which would cause a prudent and reasonable person to question the correctness of the values given by him; third, that he has made to the collector in making his entry, a full and candid disclosure of all the material facts in his possession bearing upon the value of the merchandise imported.

In the case of *Kachurin Drug Co.* v. *United States*, 26 C. C. P. A. (Customs) 356, C. A. D. 41, which was a remission case under section 489, *supra*, we said:

It is not a question as to whether the record affirmatively shows that appellant entered the goods in bad faith, but the question is whether or not it has met its burden of proving to the trial court that in making the entries such good faith was exercised as is required by the statute.

We also quote from our decision in the case of *R. W. Gresham* v. *United States*, 27 C. C. P. A. (Customs) 106, C. A. D. 70, as follows:

It is not enough in a case of this character for a petitioner, under circumstances like those at bar, to disclose a lack of knowledge of the true value of the merchandise in order to meet his burden and make satisfactory proof in the proceeding authorized by the statute involved. *Lowe Co.* v. *United States*, 15 Ct. Cust. Appls. 418, T. D. 42590. We have said that one law cannot be made for the ignorant and another for those who are versed in the law. *Schrikker* v. *United States*, 13 Ct. Cust. Appls. 562; T. D. 41433, in which *Barlow* v. *United States*, 7 Pet. 404, is cited. Moreover, it is clear that Congress by the enactment of said section 489 and its predecessor did not intend to suggest that there was a changed attitude toward the wholesome effect of the additional duty provision in protecting the revenues, nor did it intend to provide an easy means for the circumvention of the statute. *Finsilver, Still & Moss* v. *United States*, 13 Ct. Cust. Appls. 332, T. D. 41250.

In the case of *Vietor & Achelis* v. *United States*, 14 Ct. Cust. Appls. 13, T. D. 41529, this court said: ·

When an importer enters goods at a value the correctness of which he has no reasonable ground to believe, or when he states a value in reckless disregard of the truth, or when there are facts and circumstances which would put a reasonably prudent business man on inquiry as to whether the invoice value was not less than the foreign or export value of the goods in the principal markets of the country of exportation and he makes entry without such inquiry, then he represents as true that which he has no good reason to believe to be true. If that representation be false, he is legally chargeable with a misrepresentation of fact which precludes the relief accorded by section 489, Tariff Act of 1922.

We now proceed to a consideration of the facts in the light of the foregoing cases.

Appellant is, of course, responsible for the acts of its authorized agent Donahue.

Not content with withholding information from the customs officers, he misled the customs brokers employed by him in behalf of appellant. He testified that he told Nistal, the Havana customs broker, that he thought the gorilla would be admitted into the United States free of duty. He had no basis for making this statement other than he had been told by Hogeboom that it might possibly be admitted free of duty if proper documents were procured, but the witness made no effort to procure them. When asked by Nistal what the value of the gorilla was, he testified that he replied he did not know, which, no doubt, was the fact at that time, but he made no effort to ascertain from North, who was in Havana at the time, the cost of the gorilla. Nistal testified that Donahue made the positive statement to him that the gorilla was to be admitted into the United States free of duty, and we think such testimony was true for we cannot conceive why he, Nistal, an experienced customs broker, would have placed in the consular invoice the nominal value of $1,000, if such statement had not been made to him.

Donahue testified that he signed the consular invoice without reading it. This is an incredible statement. The witness held a very responsible position with appellant and was accustomed to handling business transactions involving the entire movements of the circus for several seasons. It is contrary to reason that he would sign an important document without reading it, but if he did not read it he is chargeable with gross carelessness.

When it came to making the consumption entry at Port Everglades on February 19, Donahue knew that the cost of the gorilla was $8,750, but failed to inform the customs officer of that fact. At that time he had no basis whatever for believing that the gorilla would be admitted free of duty. No documents were furnished upon which such free entry could be based, and he had been informed by the customs officers that free entry could not be made. Furthermore, he failed to inform appellant's customs broker, Moore, that the gorilla cost

$8,750, although the broker refused to make entry in his own name because of the low valuation placed in the consular invoice. Notwithstanding these facts, Donahue persisted in entering the gorilla at a valuation of $1,000, although his broker, Moore, had told him that if the gorilla was undervalued "he would be subject to various penalties, additional duty."

In view of the foregoing facts, it is unnecessary to discuss this branch of the case further and we content ourselves with the statement that appellant has fallen far short of establishing that the valuation placed in the consumption entry of $1,000 was "without any intention to defraud the revenue of the United States or to conceal or misrepresent the facts of the case or to deceive the appraiser as to the value of the merchandise."

We now come to appellant's second contention, that the gorilla had neither a foreign, export, or United States value, and since no value was ascertainable for the gorilla there could be no additional duties lawfully assessed.

The answer to this contention is that the value of the gorilla is established to have been $8,750 at the time of its importation, by being finally appraised at that sum, and appellant may not here challenge the validity of that appraisement. It had the opportunity to challenge the value fixed by the local appraiser by appeal for reappraisement, but failed to do so. It will be noted that section 489 provides that the petitioner must establish by satisfactory evidence "that the entry of the merchandise at a less value than that returned upon *final appraisement* was without any intention to defraud," etc. [Italics ours.] It is clear that under the express terms of the section the final appraised value must be accepted as an established fact, and appellant must justify his entering it at a lower value before remission of additional duties may be had. In other words, after final appraisement has been had, a petitioner may not urge that the merchandise had no dutiable value.

Furthermore, North, the president of appellant, had been advised by appellant's attorneys that the gorilla was dutiable, and appellant's agent, Donahue, had been likewise advised by appellant's customs broker, Moore, so there was no ground for belief upon the part of appellant's agents at the time of entry that the gorilla was not subject to duty.

Moreover, even if appellant could now raise the question of whether the gorilla was subject to any duty and could establish that it was not, because of lack of foreign, export, or United States value, it would seem that it was not subject to entry at all and should not have been admitted into the United States. See *Vandegrift & Co.* v. *United States*, 12 Ct. Cust. Appls. 230, 235, T. D. 40231. In that event, the gorilla would have been subject to exportation from the United States.

For the reasons stated herein, the judgment is *affirmed*.